DUNLAP, ALPERS & MOTT, FABER, COE & GREGG, INC., PACKER BROS. *v.* UNITED STATES (No. 4860) [1]

---

[1] C. A. D. 624.

United States Court of Customs and Patent Appeals, June 20, 1956

*John D. Rode* for appellant.

*Warren E. Burger*, Assistant Attorney General, *Richard E. FitzGibbon*, Chief, Customs Section (*Daniel I. Auster*, trial attorney, of counsel), for the United States.

[Oral argument April 11, 1956, by Mr. Rode and Mr. Auster]

Before JOHNSON, Acting Chief Judge, and WORLEY and COLE, Associate Judges

COLE, Judge, delivered the opinion of the court:

This case presents the question of whether a Cuban tax of 2.2% levied upon cigars sold for domestic consumption in Cuba is properly included as part of the "foreign value" of Cuban cigars imported into this country.

The cigars involved in this case were exported in April, May, and June, 1946, and entered at various invoice unit prices. They were appraised at the same unit prices net, plus 2.2% Cuban sales tax, plus case packing.

The importers appealed to a single judge sitting in reappraisement, who held that the Cuban tax was properly part of the foreign value of the imported cigars, and that since that value was higher than export value, it was the proper basis of appraisement. Reap. Dec. 8307, 32 Cust. Ct. 618. The decision of the trial judge was affirmed by the United States Customs Court, Second Division, A. R. D. 63, 35 Cust. Ct. 446, and importers appeal to this court.

It is not disputed that "foreign value" as defined in section 402 (c) of the Tariff Act of 1930 as amended is the proper basis of appraisement, if the involved tax is properly part of that value. Section 402 (c) as amended reads as follows:

(c) Foreign Value.—The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the

United States, at which such or similar merchandise is freely offered for sale for home consumption to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

It is the contention of appellants in this case that the Cuban tax involved herein does not constitute part of the "price * * * at which such or similar merchandise is freely offered for sale for home consumption" in Cuba, and hence is not part of the "foreign value" of the imported merchandise.

The factual proof consists entirely of affidavits and other documentary evidence. The decision will rest primarily upon the interpretation to be given to the documentary evidence, and the proper principles of law applicable thereto.

The evidence discloses the following general situation. Prior to 1946, Cuba had a retail sales tax on the sale of cigars by retailers to consumers. It seems to be conceded that this retail sales tax would have formed no part of the "foreign value" of cigars, since that value is based on the price at which the goods are sold "in the usual wholesale quantities." On March 27, 1946, however, the "Executive Power" of Cuba issued a proclamation (Decree No. 643) effective April 1, 1946, which changed the method of collecting Cuban taxes, including the tax on cigars.

Prior to 1946 Cuba apparently levied a sales tax as to some commodities at each stage in the distribution system, and as to other commodities only once, upon the final sale to the consumer. That is, as to some commodities there was a tax on the sale by the producer to the wholesaler, on the sale by the wholesaler to the retailer, and on the sale by the retailer to the consumer. As to other products, of which cigars was one, the tax was levied only on the final sale from the retailer to the consumer. This latter group of commodities were referred to as the commodities subject to the "Thirty-Five Million Loan taxes."

The effect of Decree 643, *supra*, upon the tax upon cigars is the primary question to be decided here. Appellants contend that the decree did not change the nature of the earlier tax, and therefore the tax, as before, should not be considered in determining foreign value. The preamble of the decree recites [1] that consideration had been given for many years to the possibility of consolidating, in one of its stages, the tax on the sale of goods, which had previously been collected in several stages from the time they are imported or produced until they

---

[1] The decree was promulgated in the Spanish language, and copies of the Spanish version are in evidence. However, both parties have introduced copies of an English translation, which are apparently identical, both having been prepared by the same firm. There is also some suggestion that the translation before us enjoys an official status in Cuba. There being no dispute as to the correctness of the English translation, all further references and quotations will be from it.

reach the ultimate consumer. The purpose of this consolidation was declared to be reduction in the number of taxpayers, thereby improving and expediting the supervision and collection of the tax. The method proposed in the decree to accomplish this purpose was to "transfer" the collection of the tax to the "Customs Houses" and the "Production Centers," thereby having one tax on a smaller number of taxpayers. The decree states that the "Executive Power" had found that one tax of 9% would produce the same revenue as the previous several taxes of 2.75%.

With respect to the commodities subject to the "Thirty-Five Million Loan" taxes (including cigars) which were levied only once, it was proposed to transfer the time of collection of that tax, with the obvious purpose of reducing the number of "taxpayers" with whom the government would have to deal. The preamble to the decree states:

WHEREAS: Taking into account that, in certain cases, the present collection system imposes the obligation to pay the tax only once, by the retailer, on mercantile transactions involving some products, and, specifically, the commodities that are subject to the Thirty-Five Million Loan taxes, the new system maintains the amount of the levy, as applicable to such cases, at the same 2.75% level, but with the additional advantage that the tax will be paid on the merchandise at the time of the purchase thereof by the retailer, and not upon being sold to the public as heretofore.

Article IV of the decree provides substantively as follows:

Article IV. This tax shall apply, at the rate of nine percent, to the sale, exchange or assignment of such merchandise as may be produced in Cuba, * * *. It shall be computed on the value of the merchandise when the sale, exchange or assignment thereof is accomplished by the producer, after deducting twenty per cent (20%), this deduction having been estimated to cover the taxes and expenses accruing on domestic goods, which do not encumber imported commodities, in order that the latter as well as the former shall be equally taxed. The tax shall be paid by the producer at the Tax and Revenue Office of his domicile, within the first twenty-five days of the month following that in which the sale, exchange or assignment of the goods may be accomplished.

Part II of Article VII of the decree modifies the tax on those commodities subject to the Thirty-Five Million Loan taxes as follows:

II: The amount of the taxes established by virtue of Articles Third and Fourth hereof shall be limited to 2.75% in the cases enumerated hereinbelow, and shall be computed in the manner provided for in said Articles:

*       *       *       *       *       *       . *

b) The articles that are subject to the special Thirty-Five Million Loan taxes. In these cases, the producer or the importer thereof shall bill the retailer separately from the selling price, for the amount of the tax.

In order to avoid confusion, it should be noted here that the 2.2% figure added by the appraiser was arrived at by taking the 2.75% tax specified in Article VII (II) and subtracting the 20 per cent deduction allowed by Article IV on Cuban produced goods, thus obtaining a net rate of tax of 2.2%.

Article XIII of the decree is also pertinent to the present discussion, and reads as follows:

Article XIII. The consumption of the merchandise by the taxpayer, or the un-justifiable loss thereof while in his possession shall be understood, for the purposes of the payment of the tax, as equivalent to the sale, exchange or assignment thereof.

In the case of losses by disasters or crimes against insured interests, the payment of the tax may be deferred until indemnity therefor shall have been collected.

Several changes and revisions of Decree 643 were promulgated subsequent to its effective date, some of which are in evidence and will be discussed in greater detail *infra*. There are also in evidence several affidavits relating to the interpretation of Decree 643 and its amendments which will also be discussed.

Appellants contend that the tax imposed upon cigars by virtue of Decree 643 formed no part of the price at which the goods were freely offered for sale to all purchasers; that it accrued only after a sale was actually made; that it is not collected as part of the selling price but is separately billed and collected as a tax from the retailer by the manufacturer acting as agent for the government; and that in such circumstances the tax is not to be considered part of the foreign value of the cigars.

The trial judge, after considering all the evidence, concluded that "the picture that emerges from the entire mass of evidence offered by the parties is as follows: (1) That the price quoted by the manufacturers for home consumption sales of cigars did not include the amount of the tax; (2) that, nevertheless, cigars could not actually be bought for home consumption at the manufacturers' level in the ordinary course of trade without liability for the tax arising; (3) that such liability arose at the time of sale; (4) that payment of the tax could be deferred until collection of the amount due under the sale; (5) that the manufacturer was responsible for collecting the tax from the retailer; and (6) that the retailer was required to pay the tax to the manufacturer." The trial judge also stated that "the determinative factor in connection with the tariff status of the tax is the salient fact that no sale at the manufacturers' level in the ordinary course of trade could be effected without liability for the tax arising thereon." The judge then drew a distinction between the time of accrual of a tax, and the time of payment of the tax, and stated that under the rule of *United States* v. *Frederick S. Passavant et al.*, 169 U. S. 16, the time of accrual was determinative. The court thought it was immaterial which of two parties to the transaction was primarily liable for the payment of the tax, since "the fact is that the cigars could not be purchased without liability for the payment of the tax arising," and it made no difference whether the tax was expressed or implied in the offer of sale, it was nonetheless present.

Upon appeal to the appellate term, the Second Division of the Customs Court affirmed the holding of the trial judge, finding that "by operation of Presidential Decree No. 643, having the force and effect of law, said tax accrued when a sale, exchange, or assignment of such merchandise was accomplished by the manufacturer or producer and, hence, by implication, became a part of the price at which such or similar merchandise was freely offered for sale for home consumption to all purchasers in the principal markets of Cuba, in the usual wholesale quantities and in the ordinary course of trade." The court held that the affidavits in evidence presenting opinions as to the interpretation of the Cuban decrees were competent evidence, since it was shown that the decrees had not been construed by the Cuban courts, but the court felt that since the decrees had not been so construed, the court was free to scrutinize and construe them itself, and that in the absence of ambiguity or references peculiar to the foreign forum, it could reject any nonjudicial interpretations which did violence to the plain intendment of the decrees. The court was of the opinion that under Decree 643 "remittance to the Government became mandatory after a sale or other divestiture of the products in question, without regard to the fact of collection from the purchaser, even though ultimate liability for the payment of the tax may have rested with the retailer." The court concluded, "It is clear to us that, under the provisions of this decree, the manufacturer, producer, or importer, as the case may be, is the taxpayer for all purposes."

The court also held that the trial judge properly relied upon the principle of the *Passavant* case, *supra*, stating:

The existence of the tax underlay every transaction involving the sale of cigars in the ordinary course of trade. It was an implied but, nevertheless, essential element in every wholesale offering. The tax became a part of the price as completely as if it had been specifically included in every manufacturer's price quotations.

We shall treat the issues involved in this case under two main headings: (1) What was the effect of the Cuban decree with respect to the tax on cigars; and (2) having determined the nature of the Cuban tax, was it part of the "foreign value" of the cigars under the Tariff Act. The answer to the first question involves the construction of Cuban law. It is not disputed here that not only the decrees themselves, but also the affidavits of men familiar with Cuban law were competent evidence as to what the Cuban law was. We shall accept both sources as competent in determining the effect of the Cuban decrees. See Wigmore on Evidence, 3rd Ed., § 1953.

Appellants have urged that the nature of the tax involved was essentially the same as the retail sales tax that had previously been levied on cigars, and that the only substantial change made by Decree 643 was that the method of *collection* of the tax was changed. We

are unable to agree with this contention. In the first place, so far as we can determine from the documents before us, it appears that the tax base was changed. Prior to Decree 643 the tax on cigars was apparently based on the retail selling price, or the retailer's "gross receipts" from the sale of cigars. Under Decree 643, the base was apparently changed from the retail selling price to the wholesale selling price. See Article IV, *supra*.

Secondly, the time of accrual of the tax was apparently changed. It is to be presumed that the pre-1946 tax did not accrue until the retailer made a sale to a consumer. Under Decree 643, however, as the courts below correctly held, the tax accrued at the time of sale by the manufacturer to the retailer, which would necessarily be prior to any resale by the retailer.

We find it difficult to determine from the evidence whether the *rate* of the tax on cigars was also changed by Decree 643. The preamble, quoted *supra*, states that the levy as applicable to the Thirty-Five Million Loan commodities was maintained at the "same 2.75% level," which would suggest that the tax rate both before and after Decree 643 was the same. However, if that were the case, it would seem that the total revenue received by the government would have been reduced because of the change in the tax base, which does not fit in with the general tenor of the expressed purposes of the decree. One of the affidavits (Exhibit 2) states that the tax "started as" 1% tax on retail sales, but other affidavits show that the rates were changed prior to 1946, so we are unable to state definitely whether Decree 643 changed the rate of the tax as applied to cigars. However, in view of the change in the tax base from the retail selling price to the manufacturers' selling price, it is clear that either the tax rate was changed, or that the government revenue was reduced.

Finally, we may ask whether or not the persons liable to pay the tax remained the same after promulgation of Decree 643 as before. Prior to 1946, there seeems to be no doubt but that the retailer was responsible for the payment of the tax to the government, although presumably he was able to pass the amount of the tax on to the individual customer. It is indicated in the evidence that the tax was based on the "gross receipts" of the retailer, thus indicating that the retailer was probably responsible for its payment irrespective of the amount collected from the consumers. There is considerable controversy over whether the tax under the Decree 643 is upon the manufacturer or whether it still remains upon the retailer. There is no doubt but that the manufacturer is able to "pass on" the tax to the retailer, by invoicing it as a separate item. However, we do not deem the circumstance of separate invoicing determinative of the question of upon what party the tax falls. It is almost axiomatic that a tax upon a manufacturer is "passed on" in some form or other to the

purchaser. The fact that it is billed separately to the purchaser certainly does not prove that the manufacturer is not primarily responsible for the tax; the tax might be due irrespective of the collection of the invoice from the purchaser. We think a more practical test of who the "taxpayer" really is, is to determine whether the liability of the party actually required to pay the tax is contingent or not. If the manufacturer were liable for the tax only if the retailer pays the invoice to the manufacturer, then it would seem that the retailer was the party primarily liable. Likewise, if in the case of goods destroyed before title passed to a retailer, the manufacturer was relieved of liability for the tax, then that also would be evidence that the burden of the tax fell primarily upon the retailer, and not upon the manufacturer.

However, although the record is not free from some doubt on the question, the evidence seems to support the conclusion of the lower court that at the time of exportations here involved the manufacturer was the "taxpayer" for all purposes, and that remittance by the manufacturer was mandatory after a sale had been made, without regard to the fact of collection from the purchaser. There is no doubt but that the manufacturer was the party who was required to actually *pay* the tax to the government. It is true that payment was not required until twenty-five days after the end of the month in which the sale was made, but there are no provisions in the copies of the decrees before us which would indicate that the manufacturer was relieved from payment if the retailer had not paid by the end of that time. It is true that one of appellants' affiants stated that "the tax does not have to be turned over to the government by the producer until long after an actual sale to and collection from a retailer has occurred." In view of the context of that statement, however, we are not convinced that affiant meant to imply that if there were no collection there would be no liability for the tax. Affiant may merely have meant to state that collections are always completed by the day the tax is due. This latter interpretation is consistent with affiant's later statement that "until and unless a *sale* is concluded" there is no liability on the part of the manufacturer or producer. From this latter statement it would seem that the manufacturer's liability arises at the time of sale, and not at the time of collection.

Other provisions in the decrees reinforce the conclusion that the manufacturer was actually the taxpayer, and the obligation to pay the tax was primarily upon it, irrespective of any payment by the retailer. Article XIII, quoted *supra*, provides that the consumption or "unjustifiable" loss of merchandise by the "taxpayer" while the goods are in his possession shall be equivalent to the sale, exchange or assignment of the goods. The only reasonable interpretation of that article is that it applies to the manufacturer or producer, who

is considered to be the "taxpayer." Liability of the manufacturer for goods destroyed in his possession is certainly inconsistent with the view that the liability is on the retailer.

Appellants have argued, and some of the affidavits state, that the manufacturer was only a "withholder" of the tax, and that the tax remained, as before, upon the retailer. However, affiants explicitly based their interpretation upon the language of Decree 5122 of December 2, 1949, which apparently replaced Decree 643. The entire text of Decree 5122 is not in evidence, but portions of it are quoted in some of the affidavits. The difficulty with accepting interpretations based upon Decree 5122 is that the date of that decree is over three years after the date the involved merchandise was exported from Cuba. The law as it existed on the date of exportation, and not as it existed several years later, is what is relevant. Of course, it may be argued that Decree 5122 merely "construed" Decree 643, and made explicit what was previously implicit. However, the full text of the decree is not before us, and what is before us makes us unwilling to assume that Decree 5122 merely "clarified" Decree 643. Prior to Decree 5122, and subsequent to Decree 643, Decree 3212 was promulgated. Article 3 of that decree provides:

Article 3. The following are bound to pay this tax in the amounts indicated, to wit:

\* \* \* \* \* \* \*

2. On the sale, exchange or assignment:
Such natural or artificial persons owning industries established in the national territory, as may sell, exchange or assign the merchandise by them produced, manufactured, obtained or distributed.

The quoted language seems to indicate that the tax under Decree 3212 was clearly on the manufacturer primarily, and not upon the retailer. The decree also provides that the producer shall declare the value of his sales, exchanges or assignments, and the sum which the producer should pay according to the "aggregate amount" of such transactions, by the 25th of the month after the month of sale, and that the "amount of the appropriate tax shall be paid simultaneously with the presentation of the sworn declaration, \* \* \* and if such payment should not be effected for any reason or cause, the competent Fiscal Administrator (Tax Collector) shall institute appropriate summary collection proceedings immediately upon the expiration of the period granted therefor." This language seems clearly to indicate that the manufacturer could not postpone payment of the tax if it had not been collected from the retailer. Although it is recognized that Decree 3212 was not in effect at the time of the instant importations, its language is so inconsistent with that quoted from the later Decree 5122, that we cannot assume that Decree 5122 merely clarified or construed the language of Decree 643.

One other point should be noted. Merely calling the manufacturer a "withholder" of the tax does not make him such. It is clear beyond question that the manufacturer in this case is not a withholder of the tax in the proper meaning of that term. To be a withholder, something must be withheld, or "held back" from another, and in reference to withholding of taxes, the word assumes that the withholder has a debt owing to the taxpayer, part of which is withheld from him and paid to the government. In the case at hand, it is obvious that the manufacturer owes nothing to the retailer, nor does he "withhold" anything from the retailer. It may be, of course, a defect in the translation, but in any event, the manufacturer is not a "withholder," as we understand the term, and it is difficult to see how he ever could be. What appellants are really arguing is that the manufacturers are "sub-collectors" of the tax. However, we do not believe the record even supports that conclusion, as hereinbefore discussed.

In view of the foregoing discussion, it is clear that we cannot accept appellants' contention that the nature of the tax under Decree 643 was the same as that previously assessed. It is true that both were sales taxes, but that was substantially the only feature not changed. The tax base of the two was different; either the tax rate or the total revenue was necessarily changed; the person liable for the payment of the tax—the person bound to pay the tax—was different; and as pointed out by the courts below, the time of accrual of the tax was different.

Having considered the nature and effect of the tax under the Cuban law, we turn now to a consideration of whether such a tax is properly part of the "foreign value" of the imported merchandise under the United States tariff laws. We must take care to point out at this juncture that a distinction must be made between interpreting and construing the Cuban law, and interpreting and construing the laws of the United States. In considering the effect of the Cuban law, we are obliged to consider the laws themselves, and the affidavits of those familiar with Cuban law, insofar as they pertain to the actual effect and characteristics of the Cuban tax. However, in determining what the proper classification of the tax is, we are not bound by the Cuban law, or the affidavits, for in classifying the tax we are construing the laws of the United States. It may well be, as appellants suggest, that the tax in question is *considered* in Cuba to be a tax on the purchaser. That is a classification for purposes of Cuban law which is no concern of ours. Our duty is to take a Cuban tax which imposes certain definite obligations under Cuban law and determine whether under United States law that tax forms part of the price at which the cigars are freely offered for sale for home consumption in Cuba. The affidavits are not competent to state whether or not the

Cuban tax is part of the freely offered price of the cigars as defined in section 402 (c), since that would require them to construe the laws of the United States.

Applying, then, the United States law to the tax involved herein, the conclusion is inescapable that the Cuban tax was properly included as part of the "foreign value" of the cigars involved herein.

In *Hugo Reisinger (Inc.) et al.* v. *United States*, 20 C. C. P. A. (Customs) 67, T. D. 45683, this court had before it the question of whether a German tax on illuminants was properly part of the foreign value of imported merchandise. One of the contentions of importers was that the tax "is obviously designed to attach to the use of illuminants after title has been acquired by the purchaser." The court quoted as follows from the brief of importers:

> The manufacturer, after he collects the tax, which, as shown, is invoiced as a separate item, makes a report to the German Government every fortnight on an official form and remits the amount collected. In doing this it is obvious that he is merely an agent of the German Government for the collection of a tax predicated upon the use of illuminants in the German territory.

The court stated that even conceding the correctness of this statement, it could not see wherein this affected the trial judge's observation that "the tax in question is simply a sales tax collected at the time of the sale of the merchandise by the German seller." The court stated—

> The tax is paid by some one upon the merchandise sold in the German market and becomes due and payable upon the sale being made. So far as the German Government is concerned, its collection is enforced at the source of that particular sale which "introduces the merchandise into the open market." The seller is liable, and the tax is actually collected by the Government from such seller, who in turn, in the ordinary course of trade, collects it from the purchaser. It is included—must be included—upon the invoice made by the seller to the purchaser. * * *

The court decided the tax was evidently "a sales tax passed on to and finally paid by the ultimate consumer," and concluded that the case could not be distinguished in principle from the *Passavant* case, *supra,* and therefore the tax was properly part of the foreign value of the merchandise.

In *Veolay, Inc., et al.* v. *United States*, 23 C. C. P. A. (Customs) 101, T. D. 47766, this court reaffirmed the rule in the *Reisinger* case, *supra,* in the case of a French tax on the retail price of perfume. The French law apparently required tax stamps to be placed upon perfumeries in some cases, and in other cases did not so require. The court construed the latter provision as follows:

> * * * its fair meaning seems to be that it rendered possible the putting of products into commerce by the "industrialists" who made them (that is, as we understand it, by the manufacturers) without the tax thereon actually having been paid to

the Government in advance, but in such cases the industrialists, or manufacturers, had become liable for such tax and the French Government regularly collected from them the amount due upon whatever deliveries had been made during the month preceding collection.

The court stated that in the case where the stamps were not used, the tax accrued before the merchandise was put into commerce and there was a fixed liability upon the manufacturer for its payment. The court found the *Reisinger* case, *supra*, applicable to these facts, stating:

> * * * Here, in those cases where the perfumery was sold without being stamped, the French act did not specify the manufacturer as the tax debtor, but by the very terms of the act he became such, and the tax accrued and the payment thereof had to be made, or assured, before the entrance of the merchandise into the open market.

*United States* v. *Passavant, supra,* relied on by the courts below, concerned a German duty described in the certificate as "a tax which is imposed by the German Government on the merchandise when it is sold by the manufacturers thereof for consumption or sale in the markets of Germany," and which "is collected when the finished product goes into consumption in Germany" but is remitted when the product is sold in bond for exportation. The Supreme Court found that the duty was part of the "actual market value or wholesale price of the merchandise as bought and sold in usual wholesale quantities at the time of exportation, in the principal markets of the country from whence imported." The Court stated:

> The certificate of facts states that the German duty is imposed on merchandise when "sold by the manufacturers thereof for consumption or sale in the markets of Germany;" and "is collected when the finished product goes into consumption in Germany." As the tax accrues when the manufacturer sells, his wholesale price includes it, and the purchaser who buys these cotton velvets in wholesale quantities in the German markets pays a price covering the tax, and that is the price for the merchandise when bought and sold in those markets.

Appellants have attempted to distinguish the *Passavant* case on certain alleged differences in fact and law, but we have been unable to perceive any material difference that would make for a different result in this case. This contention of appellants was adequately discussed by the court below, and we do not deem it necessary to discuss it at length here. However, with respect to appellants' claim that the *Passavant* case is not controlling here because of the difference in the applicable statutory law, we should additionally point out that the *Passavant* case was expressly recognized as controlling in both the *Reisinger* and the *Veolay* cases, *supra.* Those cases construed statutory provisions substantially identical to those involved here, and thus the contention that the case is not authority under the present law is unfounded.

It will be clear from the foregoing that the present case is controlled by the cited cases. The evidence and the law support the holding of the courts below that the tax became part of manufacturer's price by implication if not explicitly. The fact that the manufacturer was bound to pay the tax to the government, and that he billed the amount thereof to the purchaser, is sufficient to raise an inference, if not a presumption, that the manufacturer's quoted price was not "freely offered" but was conditioned upon payment to the manufacturer of the amount of the tax. Appellants argue here principally that the tax involved is not part of the "freely offered" price, because the tax does not accrue until after the *offer* has been made, i. e., when the *sale* has been made. The argument is that the tax "cannot possibly be said to be a part of the price at which cigars are offered for sale because unless and until a sale takes place, no tax arises or is due." However, this argument, if sound, would mean that a sales tax could never be part of the "foreign value" of merchandise unless quoted by the manufacturer as part of his offered price. As we have seen, the law is well settled that a sales tax can be part of the foreign value even though not part of the manufacturer's quoted price, so it is believed that further discussion of the argument would be neither necessary nor rewarding.

Appellants have also attempted to bring this case within the rule of *United States* v. *Wm. S. Pitcairn*, 33 C. C. P. A. (Customs) 183, C. A. D. 334, where this court held that a British "Purchase Tax" was not part of the foreign value. However, the facts in that case are substantially different from those presented here. In the *Pitcairn* case, the tax did not accrue upon sales from a manufacturer to a "registered" wholesaler, all wholesalers doing business in excess of a given gross apparently being required to be registered. Thus, there was a large class of wholesale sales which was not subject to the tax. In distinguishing that case from the *Passavant* case, *supra*, the court said, "in the instant case, the tax does not accrue when the merchandise is sold by registered manufacturers to registered wholesalers or by registered wholesalers or dealers to other registered wholesalers or dealers, but accrues only when the merchandise is sold to unregistered dealers or to the consuming public." The difficulty in applying the *Pitcairn* case here, is that apparently the only wholesale sales of cigars for home consumption in Cuba are made directly from the manufacturer to the retailer. So far as the record shows, there is apparently no wholesaler class in the cigar trade in Cuba, and the record shows no case where a wholesale sale for Cuban consumption was made upon which the tax did not accrue. In the failure of such evidence, the *Pitcairn* case cannot be applied. It is true that there was some indication that the manufacturer did make occasional

sales in small quantities to friends at the retail price, on which the tax was not charged. However, these sales were clearly not "in the ordinary course of trade" and thus are not pertinent for determining foreign value.

For the foregoing reasons, the judgment appealed from must be affirmed. It will be apparent that we have not ruled upon the question of whether a true "purchase" tax would be part of the "foreign value" in the event the purchaser paid the tax directly to the government, or the manufacturer paid the tax but had no liability therefor other than to bill the retailer and transmit the proceeds to the government when received, because we do not believe that such is the situation before us. However, it should be pointed out that the language in the *Passavant* case, as well as the others cited, would seem to indicate that it would make no difference whether the tax was upon the seller or the buyer, so long as it accrued at the time of sale. However, since the point is not before us, we express no opinion thereon. Nevertheless, in any case where the manufacturer is bound to actually pay the amount of the tax to the government, the evidence should make it clear that the manufacturer is not actually liable or responsible for the tax himself.

The judgment of the United States Customs Court is *affirmed*.

JACKSON, Judge, retired, recalled to participate.

O'CONNELL, Judge, because of illness, did not participate in the hearing or decision of this case.